# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

Mark Skolnick (MS- 9426 )
PLATZER, SWERGOLD, KARLIN,
LEVINE, GOLDBERG & JASLOW, LLP
1065 Avenue of the Americas, 18ᵗʰ Floor
New York, NY 10018
Tel: (212) 593-3000
Attorneys for Plaintiffs,
Portage World-Wide, Inc. and
Su-Hwei Lin



|  |  |
|---|---|
| Portage World-Wide, Inc., and Su-Hwei Lin | ) ) ) |
| Plaintiffs, | ) ) |
| -against- | ) ) ) |
| Manhattan Portage, Ltd. and John Peters John Wong and Service Retail Unlimited, Inc. | ) ) ) ) ) |
| Defendants. | ) ) |

**Civil Action No.**

**08 Civ. 1660 (JGK)**

**AMENDED COMPLAINT**

PLAINTIFFS, Portage World-Wide, Inc. and Su-Hwei Lin, by their attorneys, Platzer, Swergold, Karlin, Levine, Goldberg & Jaslow, LLP, allege as follows:

## THE PARTIES

1. Plaintiff, Portage World-Wide, Inc. ("PWW") is a corporation organized and existing under the laws of the State of New York, having a principal place of business at 110 Greene Street, New York, NY 10012.

2. Plaintiff Su-Hwei Lin ("Lin") is a resident of the City, County and State of New York.

3. Upon information and belief, Defendant Manhattan Portage, Ltd. ("MPL") is a corporation organized and existing under the laws of the State of New York, conducts business in the City, County and State of New York, and maintains its principal corporate office at 77 Cornell Street, Kingston, New York 12401.

4. Upon information and belief, Defendant John Peters ("Peters") is a resident of the State of New York and is also the principal shareholder and officer of MPL.

5. Upon information and belief, Defendant John Wong ("Wong") is a resident of the State of New York and is also the principal shareholder and officer of Defendant Service Retail Unlimited, Inc.

6. Upon information and belief, Defendant Service Retail Unlimited, Inc. ("SRU") is a corporation organized and existing under the laws of the State of New York, conducts business in the City, County and State of New York, and maintains its principal corporate office at 335 East 9th Street, New York, New York 10003.

## JURISDICTION AND VENUE

7. This Court has subject matter jurisdiction of this action under Title 15 United States Code § 1121, under Title 28 United States Code §§ 1331 and 1338, and under Title 28 United States Code § 1367 and principles of pendant jurisdiction.

8. This Court has personal jurisdiction over Defendant MPL by reason of its incorporation in the State of New York, its presence in New York, its transaction of business in the State of New York and this District and the commission of the wrongful acts complained of herein within the State of New York and this District.

9. This Court has personal jurisdiction over Defendant Peters by reason of his residence in the State of New York, the commission of the wrongful acts complained of herein within the State of New York and this District.

10. This Court has personal jurisdiction over Defendant SRU by reason of its incorporation in the State of New York, its presence in New York, its transaction of business in the State of New York and this District and the commission of the wrongful acts complained of herein within the State of New York and this District.

2

11. This Court has personal jurisdiction over Defendant Wong by reason of his residence in the State of New York, the commission of the wrongful acts complained of herein within the State of New York and this District.

12. Venue is proper in this judicial district under 28 U.S.C. §§ 1391 (b) and (c).

## FACTS

### Plaintiff Lin's Prior Business Relationship with Defendant Peters

13. Upon information and belief, Peters was, at all times herein mentioned, the sole shareholder of MPL.

14. Upon information and belief, MPL is and was, at all times herein mentioned, engaged in the business of manufacturing soft-sided luggage, including an extensive line of shoulder bags and messenger bags (the "Branded Goods") sold under the "Manhattan Portage" trademark and brand.

15. Prior to September 5, 2006, MPL was the owner of U.S. Trademark Registration No. 2075388 (the "Manhattan Portage Trademark"), the principal features of which include the use of the words "Manhattan Portage" and a drawing of the Manhattan skyline. The Goods and Services for which use the mark was registered consisted of "soft luggage; shoulder bags, backpacks and all purpose sport bags".

16. For many years prior to September 5, 2006, the Manhattan Portage Trademark, which included a distinctive label and logo, was used on goods manufactured by MPL and on goods which were marketed, sold and distributed by PWW pursuant to agreement with MPL.

17. Prior to September 5, 2006, Lin and Peters were the sole shareholders of PWW.

18. Prior to September 5, 2006, the principal business of PWW consisted of the marketing, and sale, at wholesale and retail, of the Branded Goods under the "Manhattan Portage" trademark, logo and brand identity. PWW also operated a retail store at 301 West Broadway, New York, NY

under the name "Manhattan Portage" (the "SoHo Store"), at which Branded Goods were sold at retail.

19. On or about September, 2005, Peters and MPL (hereinafter sometimes referred to as the "MPL Parties") commenced an action against Lin and PWW (sometimes hereinafter referred to as the "PWW Parties") in the Supreme Court of the State of New York, (the "State Court Action") arising out of alleged disputes related to the business relationship of the parties. Subsequent to the commencement of the State Court Action, and upon consent of the parties, the State Court Action was suspended pending the mediation by the parties before Resolve Mediation Services, Inc..

20. Following an extensive period of mediation, the parties entered into an Agreement of Settlement, dated September 5, 2006 (the "Settlement Agreement"), under which the State Court Action was settled. A true copy of the Settlement Agreement is attached as Exhibit "A" hereto.

**The Settlement Agreement**

21. Pursuant to the Settlement Agreement:

    a. All of Peters' right, title and interest (inclusive of his share ownership) in PWW was transferred to Lin, who became the sole shareholder of PWW;

    b. The Manhattan Portage Trademark was assigned by MPL to PWW for a price of $1,300,000.00;

    c. Peters also assigned to PWW the European Community rights to the "Manhattan Portage" trademark for which he had obtained registration in the Office for Harmonization in the Internal Market (European Community), Registration No. 000970475;

    d. A separate license agreement (the "License Agreement") was entered into, pursuant to which PWW granted MPL a non-exclusive, limited license-back of the Manhattan Portage Trademark to be used in connection with the manufacture and sale of the Branded Goods , at retail and wholesale, in a territory consisting of the Continental United States, the District of Columbia, Alaska and certain stores

in Stockholm, Sweden (the "MPL Territory"). The License had a ten year term, commencing September 5, 2006. A true copy of the License Agreement is attached as Exhibit "B" hereto;

      e.    PWW retained the right, as owner of the Manhattan Portage Trademark, to independently manufacture and market the Branded Goods world-wide.

    22.  The Settlement Agreement also contains the following express restrictions which relate directly to the rights granted to MPL under the License Agreement:

      a. MPL's rights to use the Manhattan Portage Trademark is limited to sales within the MPL Territory and does not allow sales outside of the MPL Territory (Settlement Agreement, para. 5.a(4));

      b. The MPL Parties agreed not to solicit customers outside the MPL Territory (Settlement Agreement, para. 5.(a)(4));

      c. The MPL parties agreed to use their "due diligence in policing the Manhattan Portage Trademark Rights...". (Settlement Agreement, para. 9.b)

      d. The parties agreed that they "will not make any statements disparaging one another." (Settlement Agreement, para. 27).

**Certain Restrictions Contained in the License Agreement**

    23. The License Agreement contains, among other things, the following express restrictions which relate directly to the rights granted to MPL thereunder:

      a.  <u>Labeling Restrictions</u>. The Manhattan Portage Trademark, as originally registered by MPL, contained the words "Made In" and "LTD", which, respectively, preceded and followed the words: "MANHATTAN PORTAGE". Pursuant to a separate written acknowledgment executed by the parties and incorporated into the License Agreement, MPL was expressly prohibited from using the words "Made In" or "Ltd" on any of the labels to be externally sewn on Branded Goods. MPL's said acknowledgment is attached as Exhibit "C" hereto.

      b.  <u>Restriction against grant of rights to third-parties.</u>  Paragraph 2 (d) of the License Agreement states, in relevant part, that: "Except as otherwise provided herein or in the Settlement

Agreement, Licensee shall not grant or purport to grant any right, permission or license hereunder to any third party, whether at common law or otherwise."

      c. <u>Restriction against use of confusingly similar trademarks.</u>. Paragraph 5 f. of the License Agreement states, in relevant part, that:

> "With the exception of its use of the Trademark, as permitted hereunder, Licensee shall not use any trademark, trade name, logo or any similar symbols of identification which are confusingly similar to the Trademark in connection with the manufacture, sale or marketing of any products or services or the conduct of any business".

      d. <u>Restriction against illegal use</u>. Paragraph 9 f. of the License Agreement states that:

> "Licensee shall comply with all laws, rules, regulations and requirements of any governmental body which may be applicable to the operations of the Licensee contemplated hereby, including, without limitation, as they relate to the manufacture, distribution, sale and promotion of Licensed Products".

24. Under the Paragraph 7. a.i. of the License Agreement, any uncured default in the performance of any of the terms of the Settlement Agreement also constitutes a default under the License Agreement.

**The Value and Prestige of the Manhattan Portage Trademark**

25. Since at least the early 1980's, PWW and/or MPL, its predecessor in title to the Manhattan Portage Trademark, have been continuously using the Manhattan Portage Trademark in commerce in connection with the marketing and sale of Branded Goods. PWW has expended substantial amounts of time, effort and money, including the $1,300,000 purchase price payable to MPL for the acquisition of the MPL Trademark, to acquire and promote the Manhattan Portage Trademark and brand. The restrictive covenants contained in the Settlement Agreement and License Agreement were intended to ensure that the public associates ownership of the Manhattan Portage Trademark exclusively with PWW and, also, to protect the value of that trademark against dilution by acts of MPL.

26. In addition to its having acquired the United States and European Union registration rights to the Manhattan Portage Trademark, PWW has registered the "Manhattan Portage" trademark in Japan under Trademark Registration Nos. 4804961, 4706210, 5050576, and 2647664.

6

27. As a result of the value of the Manhattan Portage Trademark and PWW's continued efforts to protect the value of the trademark, PWW has developed a substantial demand for the Branded Goods, as well as a substantial goodwill in its mark.

28. By virtue of the extensive promotion and use of the Manhattan Portage Trademark by MPL, during the period of its ownership of the mark, and, thereafter, by PWW, the Manhattan Portage Trademark has acquired a strong secondary meaning in the minds of the public and business community, and now uniquely identifies the Branded Goods. Through widespread and favorable public acceptance and recognition, the mark "Manhattan Portage" has become an asset of incalculable value as a symbol of the Branded Goods marketed by PWW throughout the world.

29. The Manhattan Portage Trademark is an inherently distinctive, non-functional, strong and famous mark.

**PWW's Business**

30. Both before and since the entry into the Settlement Agreement, PWW has been engaged in the marketing, manufacture and sale of Branded Goods world-wide. Its products are sold on a wholesale and retail basis throughout the world, via direct sales to retailers, internet sales and through distributers in Europe and Asia.

31. Under the terms of the Settlement Agreement (para. 15), PWW has the sole right to hold itself out as the exclusive authorized marketer and distributor of Branded Goods, although MPL is also authorized, subject to the terms and restrictions contained in the in the Settlement Agreement and License Agreement, to sell Branded Goods in the MPL Territory.

32. All Branded Goods sold by PWW in the United States are manufactured for PWW in manufacturing facilities located in Asia.

7

## MPL's Violation of the Labeling Restrictions

33. Almost immediately after entering into the Settlement and License Agreements, MPL violated the labeling restrictions regarding the prohibited use of the words "Made In" and "Ltd" on labels sewn onto Branded Goods it sold at retail and wholesale.

34. Subsequent to its taking over the SoHo store pursuant to the Settlement Agreement, MPL commenced selling Branded Goods containing the prohibited words.

35. In a series of discussions, PWW's counsel brought to the attention of MPL's counsel the facts supporting PWW's claim that MPL was violating the labeling restriction and, in a good-faith effort to resolve the violation, requested assurances that the default under the License Agreement and infringement of PWW's trademark would be immediately cured and that future use of the Licensed Trademark would comply with the terms of the License Agreement.

36. On February 20, 2007, Plaintiffs' attorney was advised by the attorney then representing MPL that he had been assured by MPL and Peters that the Branded Goods being sold by MPL were then "being properly affixed with new labels per the agreements".

37. Notwithstanding such assurance, PWW discovered, in or about March 2007, that MPL was continuing to sell Branded Goods with labels bearing the prohibited "Made In" words at its SoHo Store and elsewhere.

## The MPL Parties' Violation of Non-disparagement Covenant

### a) Disparagement of Quality of Goods Marketed by PWW

38. Within a short time after their entry into the Settlement Agreement and License Agreement, the MPL Parties embarked upon a pattern of conduct which was, upon information and belief, calculated to intentionally violate the covenant of non-disparagement contained in the Settlement Agreement.

39. The pattern of disparagement hereafter described was, upon, information and belief, motivated by the intent to deprive Plaintiffs of their bargained-for consideration under the Settlement Agreement and

License Agreement and to dilute the value of the Manhattan Portage Trademark purchased by PWW from MPL for a price of $1,300,000..

40.  Upon information and belief, MPL and/or Peters on numerous occasions, commencing at or about the time the Settlement Agreement was entered into, disparaged PWW and the Branded Goods it marketed by telling PWW's customers, potential customers or persons having a business relationships with PWW, in words or substance, that:

> a.  PWW (whose goods are manufactured in Asia) is making "fake" goods;
>
> b.  PWW is selling "counterfeit products";
>
> c.  MPL's goods, which are manufactured in the United States, are the real, not counterfeit Manhattan Portage products.

41.  In furtherance of MPL's apparent agenda to disparage the quality of the Branded Goods marketed by PWW, MPL made disparaging statements to personnel of PWW's Japanese distributor who visited the SoHo Store to the effect that PWW's Branded Goods were "counterfeit". Based on the statements made to its personnel, PWW's said distributor reported to PWW that it was seriously concerned that these false statements may negatively influence the distributor's business of selling the Branded Goods in Japan.

b) **Disparagement by False Accusation of Embezzlement**

42.  On or about February 20, 2007, Peters sent an e-mail to at least fifteen (15) addressees, in which he stated that:

> "due to partnership embezzelement (sic) of about $800,000.00 I do not have any credit cards and hence unable to pay my credit card bill for AOL. the (sic) result might be a cut off next week. call (sic) me at my regular phone no, (sic), if you need anything!!"

43.  Included among the addressees to whom such e-mail was sent were two attorneys who represented the PWW Parties, and the MPL Parties' own attorney. Each of the foregoing attorneys knew that the State Court Action contained certain unproven allegations identifying Lin as a party who had, allegedly, wrongfully taken money from the plaintiffs therein, including Peters.

9

44. Upon information and belief, other addressees to whom the foregoing statement was published included suppliers, business contacts and others who knew or were aware of the former relationship between the parties and that Peters had historically referred to Lin as his "partner".

45. Upon information and belief, the use of the words "partnership embezzlement (sic) " was a reference to alleged conduct by Lin, Peters' former "partner", and constituted a false accusation of embezzlement against Lin .

46. Upon information and belief, many of the addressees to whom Peters' e-mail was published could reasonably interpret the words and substance of the e-mail as an accusation that Lin had embezzled "about $800,000" from him, which act, if true, would constitute the commission of a crime by Lin.

47. Lin did not, at any time, commit an embezzlement or any act which would support a similar charge or crime.

48. Peters' accusation of embezzlement is absolutely untrue and was made maliciously and for the sole purpose of harming, disparaging and defaming Lin and to dilute the value of the Manhattan Portage Trademark purchased by PWW from MPL.

**MPL's Use of the Manhattan Portage Trademark on a "Knockoff" of the Casio "G-Shock Bag"**

49. Heretofore, PWW entered into a co-branding arrangement with Casio, pursuant to which PWW would manufacture a shoulder bag, uniquely designed by Casio, in commemoration of the 25th Anniversaries of the "G-Shock" brand owned by Casio and the Manhattan Portage brand owned by PWW.

50. In connection with its promotion of its anniversary event, Casio advertised the co-branded bags on certain Japanese web-sites in commemoration of both anniversaries.

51. Pursuant to its arrangement with Casio, PWW was to manufacture the bag, based on Casio's unique design, and the anniversary bag would be labeled with both Casio's "G-Shock" logo and the Manhattan Portage Trademark. Casio's internet advertisements for this bag displayed both such labels.

10

52. The Casio bags have design features unique to Casio and bear the Manhattan Portage label and logo on the front flap, with the Casio label appearing on the body of the bag, revealed by lifting the front flap.

53. Upon information and belief, MPL has copied the exact design features which identify the Casio bag, including those that are unique to Casio, and has incorporated the same in a replica of the Casio bag manufactured by MPL.

54. Upon information and belief, MPL has made its counterfeit replica of the Casio bag available for purchase in the United States at MPL's SoHo Store and elsewhere.

55. MPL has sewn the Manhattan Portage Trademark label on the outside flap of its "knockoff" of the Casio bag.

56. Upon information and belief, the Casio bag which MPL has "knocked off" is confusingly similar with the virtually identical bag that is co-branded by PWW and Casio, except that Casio's label has not been used.

57. Upon information and belief, MPL's use of the Manhattan Portage label on a "knock-off bag" will violate the rights of Casio, as well as the rights of PWW, thereby resulting in an illegal use of the Manhattan Portage Trademark.

58. Upon information and belief, the use of PWW's well-known trademark, label and logo on an illegal "knock-off" of the Casio bag will cause the Manhattan Portage Trademark and brand to be associated with counterfeit products, thereby damaging the reputation of PWW and diluting the value of the Manhattan Portage Trademark.

**Wrongful Use of the "T-Serve" Logo and Wrongful Use of the Manhattan Portage Trademark on Foreign Sales of Bags Bearing Such Logo and The Manhattan Portage Trademark**

59. T Serv. is a Tokyo-based bicycle messenger service that is well known throughout Japan and has achieved fame following a series of promotions for "Messenger", a movie based on T Serv. bicycle messengers.

11

60. In or about early summer of 2005, PWW accepted an order from T Serv. for the manufacture of certain messenger bags which would bear the distinctive, stylized logo of T Serv., as well as the Manhattan Portage Trademark.

61. In connection with the T Serv. order, PWW was provided with a supply of the T Serv. logo patches, which were to be sewn on the outside of the messenger bags which were to be manufactured by MPL.

62. In or about July, 2005, PWW delivered the T Serv. logo patches to MPL for use on the messenger bags MPL was to manufacture in connection with the T Serv. order.

63. Upon information and belief, MPL never completed the manufacture of the messenger bags for the T Serv. order and retained the logo patches that were to be used in connection with that order.

64. PWW subsequently arranged for the T Serv. order to be produced by an alternate manufacturing facility.

65. In or about September, 2007, PWW discovered that messenger bags manufactured by MPL after September 5, 2006 were appearing for sale in a Japanese retail store. These bags bear the T Serv. logo patch as well as the Manhattan Portage Trademark.

66. Upon information and belief, the use of the T Serv. logo on messenger bags manufactured by MPL is without the authorization of T Serv.

67. MPL's use of the Manhattan Portage Trademark in conjunction with the T Serv. logo is without the authorization of PWW.

68. MPL's use of the Manhattan Portage Trademark as aforesaid is in violation of the Settlement Agreement and of the License Agreement.

69. MPL's sale of Branded Goods outside of the MPL Territory was not authorized by PWW and is in violation of the License Agreement.

70.  Upon information and belief, MPL's use of the Manhattan Portage label in conjunction with the unauthorized use of T Serv.'s logo patch violates the rights of T Serv., as well as the rights of PWW, thereby resulting in an illegal use of the Manhattan Portage Trademark.

71.  Upon information and belief, the use of PWW's well known trademark, label and logo in conjunction with the unauthorized use of T Serv.'s logo patch could cause the Manhattan Portage Trademark and Brand to be associated with an infringement of another party's trademark, thereby damaging the reputation of PWW and diluting the value of the Manhattan Portage Trademark.

**Violation of Covenant Prohibiting Foreign Sales by MPL**

72.  Upon information and belief, MPL has, in violation of the Settlement Agreement and License Agreement, engaged in foreign sales of Branded Goods or the sale of Branded Goods for resale outside the MPL Territory.

73.  Such foreign sales constitute a violation of the Settlement Agreement and the License Agreement and an infringement of PWW's Manhattan Portage Trademark.

**Foreign Sale of Bags Under the Trademark "John Peters by Manhattan Portage"**

74.  Upon information and belief, MPL and Peters have, after the date of the Settlement Agreement and License Agreement, engaged in the manufacture and sale of goods similar to the Branded Goods and which bear the logo "John Peters by Manhattan Portage".

75.  Upon information and belief, John Peters' name has been widely associated with the Manhattan Portage Trademark, which MPL sold to PWW.

76.  Upon information and belief, the use by MPL and Peters of a label containing the words "by Manhattan Portage" will create a confusion in the minds of consumers, will be confusingly similar to the trademarks and wordmarks owned by PWW and will cause consumers to mistakenly believe that the products on which such words are used are "Branded Goods".

77. The use by Peters and MPL of the aforesaid label constitutes a violation of the Settlement Agreement and the License Agreement and an infringement of PWW's rights in the Manhattan Portage Trademark.

### The MPL Parties' Wrongful authorization of East Ninth Street Store to use Manhattan Portage Trademark

78. Contrary to the clear prohibition contained in the License Agreement against licensing or granting rights to the use of the Manhattan Portage Trademark to third-parties, the MPL Parties have, upon information and belief, granted to Defendants Wong and SRU the purported authority to use the Manhattan Portage Trademark in commerce.

79. Upon information and belief, the MPL Parties have aided, participated in and authorized Defendants Wong and SRU to open and operate a "Manhattan Portage" Store at 335 East 9th Street, New York, NY. (the "East 9th Street Store").

80. The East 9th Street Store prominently displays outside signs and a neon sign in its window, which signs consist of the Manhattan Portage Trademark and which purport to identify the East 9th Street Store as a "Manhattan Portage" store . The 9th Street store bears no other trade name.

81. PWW has never authorized or consented to the use of the Manhattan Portage Trademark to identify the East 9th Street Store operated by Wong and SRU.

82. Although the MPL Parties have no right to authorize the use of the Manhattan Portage Trademark to any third-party, MPL, in signage appearing in the window of its SoHo Store, refers to the 9th Street Store as "our East Village Store". Business cards handed out by MPL in its SoHo store show retail stores operated at the SoHo store location, as well as at the location of the 9th Street Store.

83. On or about December 11, 2007, following his receipt of Plaintiffs' notice of termination of the License, as described below, Peters sent an e-mail to Lin, stating, in relevant part:

> " I have nothing to do with the [East Village] store. John Wong from the ups (sic) store opened it and I only supply him with products....I am not associated with the store in any legal way and if you want me to stop selling to him I will do that."

14

84. Upon information and belief, telephone calls to the 9th Street Store are answered: "Manhattan Portage".

85. The foregoing acts related to the operation of the 9th Street Store, all of which the MPL Parties have wrongfully authorized, participated in and promoted, are calculated to and have caused customers and the public to be confused as to who is authorized to use the Manhattan Portage Trademark. The signage at the 9th Street Store, which illegally uses the Manhattan Portage Trademark, suggests a relationship between the 9th Street Store and PWW. All of the foregoing tend to infringe and dilute the value of the Manhattan Portage Trademark.

86. On December 26, 2007, PWW, through its counsel, demanded that Wong and SRU cease and desist from the continued use of the Manhattan Portage Trademark in the manner described herein.

87. Despite such demand to cease and desist from such use of PWW's trademark, Wong and SRU have failed and refused to do so and continue to use the Manhattan Portage Trademark on signage on the outside of the 9th Street Store and on a neon sign in its window.

**Notice to of Default Sent to MPL Parties**

88. On or about March 12, 2007, the PWW Parties, through their counsel, sent MPL and Peters a notice of default, in writing, setting forth the details in which such defendants' conduct constituted a default under the terms of the Settlement Agreement and the License Agreement.

89. Such notice of default also provided notice that, unless such parties cured such acts of default under the terms of the Settlement Agreement and the License Agreement within the applicable cure periods provided therein, PWW would exercise its right to terminate the License Agreement.

90. Such notice of default further demanded that the "MPL Parties immediately cease and desist all use of the [Manhattan Portage[ Trademark in any manner that violates the terms of the License Agreement and the Settlement Agreement, or otherwise infringes PWW's Trademark".

91. Such notice of default further demanded that MPL and Peters immediately:

    a. "Promise in writing not to make improper use of the Licensed Trademark at any time in the future";

    b. "Recall all products, labels, promotional and marketing materials on which inappropriate use of the Trademark is made";

    c. "Provide [PWW] with a full accounting of all products produced by the MPL Parties after the effective dates of the Settlement Agreement and the License Agreement that bear the infringing or inappropriately used trademark or that fail to provide appropriate notices of attribution, so that appropriate damages can be calculated ".

**Termination of the License Agreement**

92. MPL and Peters did not cure the defaults as required by the Plaintiffs' notice of default.

93. As of December 7, 2007, MPL and Peters remained in default of the Settlement Agreement and the License Agreement, in that, among other things:

    a. They continued to disparage the Plaintiffs;

    b. They continued to misuse the licensed Manhattan Portage Trademark;

    c. They continued to infringe the Manhattan Portage Trademark; and

    d. They continued to sell Branded Goods outside the MPL Territory.

94. By reason of the foregoing, Plaintiffs, through their counsel, on December 7. 2007, sent Peters and MPL a "**NOTICE OF TERMINATION OF LICENSE**" (the "Notice of Termination").

95. The Notice of Termination provides that:

    "NOTICE IS HEREBY GIVEN THAT, PURSUANT TO THE PROVISIONS OF PARAGRAPH 7(B) OF THE LICENSE AGREEMENT, PWW HEREBY EXERCISES ITS RIGHT TO TERMINATE THE LICENSE GRANTED TO MPL THEREIN, EFFECTIVE TEN (10) DAYS FROM THE DATE HEREOF (THE "LICENSE TERMINATION DATE")."

96. Pursuant to the Notice of Termination, the License granted pursuant to the License Agreement terminated on December 17, 2007 (the "License Termination Date").

97. The Notice of Termination further stated that:

"Please take further notice that paragraph 8 of the License Agreement (Effect of Termination) states that:

"...Upon and after the termination of this License, all rights granted to Licensee hereunder, together with any interest in and to the Trademark which Licensee may acquire, shall forthwith and without further act or instrument be assigned to and revert to Licensor. In addition, Licensee will execute any instruments reasonably requested by Licensor which are necessary to accomplish or confirm the foregoing. Any such assignment, transfer or conveyance shall be without consideration other than the mutual agreements contained herein. Licensee shall thereafter refrain from further use of the Trademark or any further reference to them direct or indirect, or any other trademark, trade name or logo that is confusing similar to the Trademark, or associated with the Trademark in any way, in connection with the manufacturer, sale or distribution of Licensee's products."

"    Accordingly, demand is hereby made that, effective as of the License Termination Date, MPL, its agents, representatives and employees, cease and desist from any further use of the Trademark (or any mark that is confusingly similar to the Trademark) in any manner prohibited by the License Agreement or applicable law.

"    Please take further notice that any unauthorized use by MPL, its agents, representatives or employees of the Trademark after the License Termination Date shall constitute, among other things, an infringement of the Trademark and a violation of PWW's intellectual property rights. In the event of any such violation, PWW shall pursue all remedies available to it at law or in equity."

98. Despite PWW's demand that MPL cease and desist form any further use of the Manhattan Portage Trademark, MPL has failed and refused to honor such demand and, upon information and belief, continues to use the Manhattan Portage Trademark on goods it sells as well as in connection with its operation of the SoHo Store.

99. The continued use by Defendants of the Manhattan Portage Trademark or any mark that is confusingly similar thereto constitutes an infringement of the PWW's trademark rights in the Manhattan Portage Trademark.

## COUNT I

### False Designation of Origin and Unfair Competition under 43(a) of the Lanham Act

100. Plaintiff realleges and incorporates herein by this reference the allegations of paragraphs 1-99 above as if set forth in full herein.

17

101. Defendant's infringing use of the Manhattan Portage Trademark is likely to cause consumers mistakenly to believe that the Defendants have an affiliation with Plaintiffs, or that the Defendfants have PWW's permission to use the Manhattan Portage Trademark.

102. By engaging in the activities described above, Defendants have made and are making false, deceptive and misleading statements constituting unfair competition, false representations and false advertising made in connection with services distributed in interstate commerce in violation of Section 43(a) of the Lanham Act, 15 U.S.C. §1125(a).

103. Defendants' continued acts of unfair competition, false representations and false advertising have caused irreparable injury to Plaintiffs' goodwill and reputation in an amount that cannot be ascertained at this time and, unless restrained, will cause further irreparable injury, leaving Plaintiffs with no adequate remedy at law.

104. By reason of the foregoing, Plaintiffs are entitled to injunctive relief against Defendants, restraining further acts of unfair competition, false representations and false advertising, and, after trial, to recover any damages proven to have been caused by reason of Defendant's aforesaid acts of false designations of origin, false representations and false advertising.

## COUNT II

### Dilution under 43(c)) of the Lanham Act

105. Plaintiffs reallege and incorporate herein by reference  the allegations of paragraphs 1-99 above as if set forth in full herein.

106. As a direct result of the long and continued use of the Manhattan Portage Trademark in connection with the sale of Branded Goods, which have attained world-wide popularity, PWW's Manhattan Portage Trademark has become famous.

107. The aforesaid acts of Defendants are misleading the public into believing that Defendants are connected to or are otherwise associated with Plaintiff.

108. Upon information and belief, Defendants willfully intended to cause dilution of the of the Manhattan Portage Trademark.

109. The aforesaid acts of Defendants are likely to deprive PWW of the benefit of the goodwill attached to Manhattan Portage Trademark, injure PWW's reputation and dilute the distinctive quality of Plaintiffs' mark in violation of Section 43(c) of the Lanham Act, 15 U.S.C. §1125(c)).

110. Defendants' infringement and willful acts of dilution have caused and are causing great and irreparable injury to PWW and PWW's Manhattan Portage Trademark and to the business and goodwill represented thereby, in an amount that cannot be ascertained at this time and, unless restrained, will cause further irreparable injury, leaving Plaintiffs with no adequate remedy at law.

111. By reason of the foregoing, Plaintiffs are entitled to injunctive relief against Defendants restraining further acts of trademark infringement and dilution and, after trial, to recover any damages proven to have been caused by reason of Defendant's aforesaid acts of dilution.

## COUNT III

### Dilution under State Law

112. Plaintiffs realleges and incorporate herein by this reference the allegations of paragraphs 1-102 above as if set forth in full herein.

113. The aforesaid acts of Defendants are likely to injure the business reputation of the Plaintiffs and dilute the distinctive quality of and goodwill symbolized by Plaintiffs' Manhattan Portage Trademark in violation of the New York General Business Law §360-l.

## COUNT IV
(Against Defendants MPL and Peters)

### Defamation under State and Common Law

114. Plaintiffs repeat and reallege paragraphs 42 through 48 as fully and to the same extent as if set forth at length herein.

115. At the time that Peters and MPL published the defamatory matter quoted above, such Defendants knew that it was false and published it in reckless disregard of its falsity.

116. Said Defendants composed, published and disseminated the communication containing the said defamatory matter maliciously and with the intent to injure Plaintiff Lin in her reputation and in her profession.

117. By reason of the foregoing, Plaintiff Lin was greatly injured in her professional reputation and character and suffered great mental pain and anguish, all to her damage in a sum to be determined at the trial of this action, but not less than $2,000,000.

**WHEREFORE**, Plaintiffs pray for the following relief:

A. With respect to Count I:

(i) a declaration that the License Agreement, by reason of the defaults by the MPL Parties and the PWW Parties' excercise of their rights to terminate the License Agreement, has been terminated as of the License Termination Date; and

(ii) granting Plaintiffs judgment for money damages in an amount to be proven at the trial of this action, but in an amount of not less than $1,300,000;

B. With respect to Count II:

(i) a declaration that Defendants' unauthorized conduct violates Plaintiffs' rights under the Lanham Act, the New York General Business Law and the common law; and

(ii) granting Plaintiffs judgment for money damages in an amount to be proven at the trial of this action, but in an amount of not less than $1,300,000 .

C. With respect to Counts I, II and III, an Order immediately, preliminarily and permanently enjoining and restraining Defendants, their officers, agents, servants, employees and attorneys and those persons in active concert or participation with it from:

(i) using the Manhattan Portage Trademark in commerceor any other designation confusingly or deceptively similar to thereto;

(ii) diluting in any way PWW's Manhattan Portage Trademark or representing by any means whatsoever, directly or indirectly, that any products offered or provided by Defendants are associated

20

with PWW or from otherwise taking any action likely to cause confusion, mistake or deception on the part of consumers as to the origin of said products; and

(iii)    doing any other acts or things calculated or likely to cause confusion or mistake in the mind of the public or to lead consumers into the belief that services or products offered, sold, distributed or transmitted by the MPL Parties are authorized, sponsored, licensed, endorsed, promoted or condoned by PWW, or are otherwise affiliated with or connected to PWW, and from otherwise unfairly competing with PWW or infringing any other intellectual property of PWW.

D.  With respect to Counts I, II and III, an Order that Defendants, pursuant to 15 U.S.C. § 1116(a), be directed to file with this Court and serve upon Plaintiff within thirty (30) days after entry of the injunction, a report in writing under oath setting forth in detail the manner and form in which they have complied with the injunction.

E.  An Order that Defendants account to and pay over to Plaintiff s all of the profits realized by Defendants, or others acting in concert or participation with Defendants, from the sale and distribution of their goods in connection with the foregoing acts of trademark infringement, dilution, and unfair competition under Federal and State law.

F.  An Award to Plaintiffs of three times Defendants' profits or three times Plaintiffs' damages, whichever is greater, together with  Plaintiffs' costs, reasonable attorneys' fees and disbursements in this action, pursuant to 15 U.S.C. §1117 and 17 U.S.C. §505.

G. With respect to Count IV, an Award against the MPL Parties in favor of Lin in the amount of such compensatory damages as the Court shall determine, and punitive damages in an amount of no less than $2,000,000.

F.  An Award to Plaintiffs for such other and further relief as the Court deems just and proper.

New York, New York
Dated: April 9, 2008

Respectfully Submitted,
**Platzer, Swergold, Karlin, Levine
Goldberg & Jaslow, LLP**

Mark Skolnick (MS- 9426 )

Attorneys for Plaintiffs
Portage World-Wide, Inc. and Su-Hwei Lin
1065 Avenue of the Americas
New York, New York 10018
Tel: (212) 593-3000

**EXHIBIT A**

## AGREEMENT OF SETTLEMENT

**AGREEMENT,** made as of September 5, 2006 between and among John Peters ("Mr. Peters"), Manhattan Portage Ltd. ("MPL"), Su-Hwei Lin ("Ms. Lin"), and Portage World-Wide, Inc. ("PWW").

**WHEREAS,** the Parties are Parties to an action currently pending in the Supreme Court of the State of New York County of New York, entitled *John Peters, Manhattan Portage, Ltd. and Portage World-Wide, Inc. v. Su-Hwei Lin, Portage World-Wide, Inc. and John Does 1 and 2 (being fictitious names)*, Index No. 603312-05; (the "Action");

**WHEREAS,** the Parties wish to resolve the Action and any claims, defenses and any cross-claims and counterclaims that are or could be raised between and among the Parties in the Action;

**WHEREAS,** the Parties wish to reorganize their business relationship so that they may do business together in the future, subject to the following revisions in form, function, ownership, rights and obligations, and any further modifications thereof to which they may subsequently agree;

**NOW, THEREFORE,** in consideration of the premises and of the covenants and agreements contained herein, the Parties agree as follows:

1.   *Definitions.*
     a)   The "Branded Goods" shall mean luggage and accessories, in International Classes 18 and 22 (established by the Committee of Experts of the Nice Union, promulgated in *International Classification of Goods and Services for the Purposes of the Registration of Marks* (8th ed. 2002), published by the World Intellectual Property Organization), bearing the Manhattan Portage Trademark, manufactured by MPL or PWW.

     b)   The "Closing" shall mean the consummation of the transactions contemplated by this Agreement of Settlement, including the execution of such other agreements and documents as the Parties shall deem necessary and appropriate, to take place at a time and place mutually agreed upon by the Parties.

     c)   The "Manhattan Portage Trademark" shall mean the name, mark and design including the words "Manhattan Portage," of which MPL is the registered owner with the United States Patent and Trademark Office, Registration No. 2075388, and which MPL has used and is using in the United States and in other countries.

     d)   The "Manhattan Portage Trademark Rights" shall mean the Manhattan Portage Trademark and all other rights and privileges associated with that name and mark, including, without limitation, all intellectual property rights associated with the Brand, and good will of the business associated with the Manhattan Portage Trademark, together with the right to sue, and be entitled to any damages, for infringement of the Manhattan Portage Trademark.

     e)   "MPL Branded Goods" shall mean Branded Goods manufactured by MPL, which shall bear words stating or indicating that said goods are manufactured in the United States.

f)     "MPL" shall mean Manhattan Portage, Ltd., a New York corporation, of which Mr. Peters is and shall remain a majority owner. The "MPL Parties" shall mean business entities of which Mr. Peters is a majority owner.

g)     The "MPL Territory" shall mean the Continental United States, *i.e.*, the 48 contiguous states plus the District of Columbia and Alaska, and the Etcetera Stores in Stockholm, Sweden, but excluding Hawaii.

h)     "PWW Branded Goods" shall mean Branded Goods manufactured by PWW, which shall not bear words stating or indicating that said goods are manufactured in the United States.

i)     "PWW" shall mean Portage World Wide, a New York corporation, of which Ms. Lin is and shall remain a majority owner. The "PWW Parties" shall mean business entities of which Ms. Lin is a majority owner.

j)     The "PWW Showroom" shall mean a showroom maintained and operated by the PWW Parties at 110 Greene Street, Suite 407, New York, NY 10012.

k)     The "SoHo Store" shall mean the retail store selling Branded Goods presently operating at 301 West Broadway, New York, NY 10013.

l)     "Store Territory" shall mean the urban area in which the MPL Parties currently have or in the future may open a retail store. "Store Location" shall mean a specific retail store in the Store Territory.

m)     The "United States" shall mean the Continental United States, *i.e.*, the 48 contiguous states plus the District of Columbia and Alaska.

2.     *Reorganization of PWW and MPL.*

a)     Mr. Peters shall transfer and assign all of his right, title and interest in PWW to Ms. Lin, including, but not limited to, his fifty shares of stock in PWW. Mr. Peters will also resign as director of PWW and as an officer of PWW.

b)     Ms. Lin shall resign as Vice President of MPL.

3.     *Assignment of the Manhattan Portage Trademark with Security Interest, and License of Certain Rights Back to MPL.*

a)     At the Closing, MPL shall assign to PWW the Manhattan Portage Trademark Rights, including without limitation, the right to sue, and be entitled to any damages, for infringement of the Manhattan Portage Trademark before or after the date of transfer thereof, subject to the terms and conditions set forth herein, which include the creation of a security interest in favor of MPL under the conditions specified in § 17 hereof.  MPL

has not encumbered the Trademark in any way nor is aware of any liens against the same.

b) Concurrently with the aforesaid assignment, PWW will license to one or more of the MPL Parties the rights to manufacture and sell at retail and wholesale the Branded Goods in the MPL Territory as provided herein. Notwithstanding the foregoing, PWW may also manufacture outside the United States and sell at retail and wholesale the Branded Goods in the MPL Territory as provided herein, except, subject to the conditions set forth herein below, PWW may not open retail stores in New York City during the term of the License to MPL. In addition, PWW may use any manufacturer to cover in the event that MPL cannot supply PWW with requested MPL styles or goods.

c) As part of this Agreement of Settlement, the Parties will execute all necessary documentation, including without limitation the Pledge and Security Agreement in the form attached hereto, and cooperate in necessary filings to record with the United States Patent and Trademark Office evidence of the creation of a security interest in favor of MPL in the trademark assigned hereunder. In addition, PWW shall execute all necessary documentation and cooperate with MPL to provide MPL with a license back of the Manhattan Portage Trademark Rights (the "License Back"), together with an authorization for filing of a UCC-1 with the New York Department of State and the New York County Clerk and such other evidence to record MPL's security interest in the Manhattan Portage Trademark Rights as collateral for PWW's obligations to make payment of the Transfer Price ("Obligations").

4. *Transfer Price.*

a) PWW shall pay MPL $1.3 million in installments over an eight-year period (hereinafter the "Installment Payments"), as follows:

(1) At the Closing, upon execution of the Assignment and Licensing Agreement(s) contemplated herein, $100,000;

(2) The amount of $12,631.58 in 95 consecutive monthly installments on the first business day of the month, beginning on:

(i) the next month after the Closing so long as the first business day of that month is at least 25 days after the Closing; or

(ii) the first business day of the month following the month after the Closing if the first day of the month after the Closing is less then 15 days after the Closing.

5. *License Back by PWW to MPL.* At the Closing, PWW, as Licensor, and MPL as Licensee, will enter into a License Agreement, which shall provide for the manufacture and sale of Branded Goods by MPL, subject to the limitations contained therein, as follows:

a)   *MPL Branded Goods.*

    (1)   MPL shall have the right to manufacture within the United States MPL Branded Goods.

    (2)   MPL shall have the right to sell MPL Branded Goods to customers, including consumers, retailers, chain stores, department stores and corporate promotional customers, in the MPL Territory, but not to existing PWW customers.

    (3)   Any sales by MPL of MPL Branded Goods to customers outside the MPL Territory, if at all, must be made by selling to PWW, as a sales representative, at a discount of 15% off the regularly listed wholesale price for sale to customers within the MPL Territory.

    (4)   The MPL Parties agree not to solicit customers outside of the MPL territory.

    (5)   Notwithstanding 5.a)(3) hereinabove, MPL may sell MPL Branded Goods to the Etcetera Stores in Sweden, subject to the condition that MPL shall lose this right to sell to Etcetera Stores if MPL Branded Goods sold by MPL to the Etcetera Stores are subsequently sold directly or indirectly by the Etcetera Stores to purchasers outside of Sweden.

    (6)   The PWW Parties may act as non-exclusive sales agent within the MPL Territory for MPL Branded Goods, in exchange for a commission of:

        (i)   10% on sales totaling under $5,000.00; and

        (ii)   15% on sales of $5,000.00 or more.
        All such sales transactions are subject to approval by the MPL Parties, which approval shall not be unreasonably withheld or delayed.

    (7)   The PWW Parties may purchase and take delivery from MPL, and MPL agrees to make available at a 15% discount off the regular wholesale price, domestically-manufactured MPL Branded Goods for use by PWW's customers as corporate promotional items.

    (8)   Although MPL may not use the name "Manhattan Portage" as part of any internet domain name, it may prominently display that term and Mark on its websites and may use the "Manhattan Portage" name in metatags or similar routing mechanisms directing browsers or persons performing internet searches to MPL's websites.

b)   *PWW Branded* Goods. The License Agreement shall provide that the PWW Parties may sell PWW Branded Goods in the MPL Territory, as follows:

(1)     Within the MPL Territory the PWW Parties may sell PWW Branded Goods wholesale, but not to existing MPL customers.

(2)     If initiated by internet customers and completed as internet transactions via the www.manhattanportage.com web site or any of its other web sites;

(3)     Of corporate promotional items; and

(4)     To Department Stores or Chain Stores.

6.    *Retail Operations.*

    a)     PWW and Ms. Lin shall use best efforts to effect a transfer to the MPL Parties of the lease for the SoHo Store prior to expiration of the current lease (or any short extensions thereof as may be agreed upon). The PWW Parties represent that PWW has obtained an extension of the lease through September 2006. As of the date agreed upon by the Parties at the Closing, the MPL Parties shall have the exclusive rights to own and operate the SoHo Store. The MPL Parties shall have the right to conduct retail business selling MPL Branded Goods anywhere in the MPL territory, including the exclusive right to sell MPL Branded Goods in flagship stores in New York city. M PL must obtain written acceptance of the terms of the License Agreement from any MPL Party conducting retail operations as set forth in this Agreement, which acceptance shall be promptly delivered to PWW. If any MPL Party loses its status as an MPL Party, it shall immediately lose its rights as licensee hereunder and under the License Agreement, then MPL shall provide notice and copy of same to PWW.

    b)     PWW shall be entitled to own and operate retail stores in the MPL Territory, except for New York City, provided the establishment and operation of such stores does not create inter-store economic competition with MPL stores. PWW shall stock any retail store it opens exclusively with MPL Branded Goods listed in the MPL catalogue. If, however, MPL cannot fill a purchase order for such MPL products for PWW's retail store's inventory within a commercially reasonable time frame, then PWW may cover by having these goods produced by another manufacturer. PWW may purchase and take delivery from MPL, and MPL agrees to make available at a 20% discount off the regular wholesale price, domestically-manufactured MPL Branded Goods for sale by PWW in any such retail store.

    c)     Notwithstanding the exclusive grant of rights to the MPL Parties to conduct retail operations in New York City in flagship stores, the MPL Parties will lose such exclusive rights and PWW Parties may conduct retail operations and make retail sales in New York City in an equivalent store if a New York City store closes without the opening of a comparable store by the MPL Parties at the same store location within six months thereafter.

    d)     The PWW Parties and the MPL Parties shall cooperate with each other in effecting an orderly transition of the operation of the SoHo Store. All inventory in the

SoHo Store and the CPU is acknowledged by the parties to belong to PWW and PWW shall be responsible for moving said inventory and CPU to another location or location in connection with said transfer. The remaining furniture, fixtures and improvements shall be the property of the MPL Parties as of the date of such transfer. Regardless of whether the MPL Parties take over the operations of the SoHo Store before or after one or more of them sign a new lease, the MPL Parties shall be responsible for payment of all bills and invoices by vendors and suppliers to the SoHo Store of equipment, utilities or other services from and after the date of said transfer, and the PWW Parties shall continue to be responsible for such costs before the date of said transfer. No portion of the transfer price shall be allocated to any item of tangible personal property transferred hereunder. Each party shall cooperate in preparing, executing, and delivering to the other such a bill of sale in the usual and customary form as may be reasonably requested by the other in order to evidence the transfer for no separate consideration of the said items of tangible personal property. MPL shall be solely responsible for the rent for the Soho store after Closing.

e) In the event the MPL Parties close a Store Location, they will give the PWW Parties notice that they have done so within two weeks of the date of closing.

f) The Parties may make retail sales for reasonable liquidations and close-outs, consistent with industry practice.

g) Neither of the Parties will engage in "dumping", *i.e.*, the sale of their respective products at prices which do not have a reasonable market value.

7. *PWW Showroom.* The PWW Parties may continue to operate the PWW Showroom, and shall have the exclusive right to own and operate the PWW Showroom, subject to the terms of the License Agreement contemplated herein. The PWW Showroom shall be used for wholesale and internet purposes only, except that it may conduct limited seasonal sample sales to the extent consistent with the custom and practice of this industry.

8. *Repairs to Branded Luggage.* The Parties are not responsible for fulfilling customer claims for repairs to or replacements of each others' products. Customer claims for repair or replacement of the respective Branded Goods will courteously and promptly be referred for handling and resolution to the product(s)' manufacturer.

9. *Quality Control.*

a) The License Agreement may provide that PWW may set commercially reasonable standards for and conduct reasonable inspections of components of goods and finished goods produced under License, and that MPL shall assure that in manufacture these quality control standards are fully met, and that the MPL retail stores are maintained at a certain level of financial health and of quality of interior design, display and merchandising. The License Agreement shall provide for mechanisms for giving

notice of a failure to meet PWW's commercially reasonable quality control standards and for mechanisms for correction of any such failures.

b)    So long as it retains the Manhattan Portage Trademark Rights, PWW shall be responsible for policing and defending the Manhattan Portage Trademark Rights. Both parties shall use due diligence in policing the Manhattan Portage Trademark rights, provided that if MPL discovers any infringement, it shall report such information to PWW but shall have no obligation to take any further action or incur any expenses in connection therewith.

10.    *License Term.* The term of the License from PWW to MPL shall be for a 10 year term.

11.    *Assignability by PWW Parties of Rights Licensed to MPL.* Ms. Lin and the PWW Parties warrant and agree that during the term of the license no assignment or other transfer of PWW's rights and privileges with respect to the MP trademark and trade name will be effected that will diminish or otherwise impair the rights and privileges granted to the MPL Parties under the license.

12.    *Assignability.* The MPL Parties may not assign the rights and privileges granted to them pursuant to the License Agreement, absent written approval by the PWW Parties. Any such attempted assignment or transfer in violation of this § 12 shall be void.

13.    *Cooperation.* The MPL Parties will execute all necessary documentation and cooperate in necessary filings to assign the Manhattan Portage Trademark Rights to PWW and to record evidence of PWW's ownership and title thereto, at all relevant times.

14.    *Internet Sales and Domain Name.* The MPL Parties assign to PWW, and PWW shall retain, all right, title and interest in the "www.manhattanportage.com" domain name. MPL Parties shall duly execute and deliver all documents reasonably necessary to effect an assignment.

15.    *Distribution of Branded Goods.* PWW may hold itself out as the exclusive, authorized marketer and distributor for Branded Goods. Nothing herein shall bar the MPL Parties from selling, or holding themselves out as authorized to sell, MPL Branded Goods in the MPL Territory.

16.    *Designs of Branded Luggage.* MPL will make available for use by PWW all new styles for MPL Branded Goods created by MPL, or under its direct supervision, contemporaneously with their release for domestic use by MPL.

17.    *Event of Payment Default.*

a)    It will be an Event of Default of the Obligations if (a) PWW fails to make any of the Installment Payments at the time required hereunder, and fails, after

Agreement of Settlement                             - 7 -

transmittal by MPL of written notice of such failure and the passage of twelve (12) business days' grace period, to make said Installment Payment.

    b)    If there is an Event of Default of the Obligations, in addition to any other rights, remedies, damages, or relief otherwise available to MPL, MPL shall have all of the rights set forth in the Pledge and Security Agreement entered into by the parties contemporaneously herewith, a true copy of which is attached hereto.

18.    *Indemnification.*

    a)    *Indemnification of the PWW Parties by the MPL Parties.*

        (1)    *General.* The MPL Parties will indemnify and hold harmless the PWW Parties against any loss, cost, expense, liability, deficiency, or damage to the PWW Parties (including, without limitation, reasonable attorneys' fees and disbursements) resulting from, arising out of, or based upon:

            (i)    Any false, incorrect, or inaccurate warranty or representation made by the MPL Parties in this Agreement of Settlement or any Schedule or Exhibit annexed hereto or any other documentation furnished to the PWW Parties by the MPL Parties;

            (ii)    The breach or default in the performance by the MPL Parties of any of the agreements made by it hereunder or covenants to be performed by it hereunder;

            (iii)    transactions and operations associated with the SoHo Store occurring after transfer thereof to the MPL Parties, including rent; or

            (iv)    Any claim by any third party made against the PWW Parties that the manufacture, labeling or construction of the MPL Branded Goods caused personal injury and/or property damage; and

            (v)    Any and all actions, suits proceedings, demands, assessments, judgments, costs or expenses (including reasonable attorneys' fees and disbursements) related to any of the foregoing.

        (2)    *Notice of Claim.* The PWW Parties shall notify MPL in writing promptly after they have actual knowledge of any claim as to which indemnity may be sought (hereinafter referred to as an "MPL Indemnitor Claim").

            (i)    If the claim is one brought by a third party as set forth in § 18 hereof, the MPL Parties shall be entitled, at their own expense, though legal counsel of their own choosing or otherwise, to defend or settle any such MPL Indemnitor Claim. If the PWW Parties, without the prior consent of the MPL Parties (which consent shall not be unreasonably

withheld) make any settlement with respect to any such MPL Indemnitor Claim, the MPL Parties shall be discharged from any liability hereunder with respect thereto, it being understood that the PWW Parties shall have the absolute right, in their sole discretion and without the consent of the MPL Parties to settle any and all such MPL Indemnitor Claims. If the MPL Parties fail to defend an MPL Indemnitor Claim as set forth in this § 18, the PWW Parties shall have the right to do so and the PWW Parties shall be entitled to recover, in addition to all amounts contemplated herein the entire cost of such defense from the MPL Parties. Any judgment rendered against the PWW Parties, or any of their respective successors or assigns, resulting in or from said MPL Indemnitor Claim, except during a stay of execution pursuant to an appeal at the MPL Parties' expense, shall be immediately paid or discharged by the MPL Parties.

(ii)     In the event the MPL Parties breach their obligations hereunder, triggering a claim under 18.a.(1)(ii), and the PWW Parties identity such breach in their Notice of Claim and choose to withhold the making of one or more payments due by PWW to MPL hereunder, such nonpayment shall not constitute an Event of Default only if: (a) a Court of competent jurisdiction finds that MPL committed the breach so identified in PWW's Notice of Claim, or (b) the MPL Parties agree in writing signed by the MPL Parties specifically to waive the occurrence of an Event of Default with regard to the particular acts of nonpayment in question.

b)     *Indemnification of the MPL Parties by the PWW Parties.*

(1)     *General.* The PWW Parties will indemnify and hold harmless the MPL Parties against any loss, cost, expense, liability, deficiency, or damage to the MPL Parties (including, without limitation, reasonable attorneys' fees and disbursements) resulting from, arising out of, or based upon:

(i)     Any false, incorrect, or inaccurate warranty or representation made by the PWW Parties in this Agreement or any Schedule or Exhibit annexed hereto or any other documentation furnished to the MPL Parties by the PWW Parties;

(ii)     The breach or default in the performance by the PWW Parties of any of the agreements made by it hereunder or covenants to be performed by them hereunder;

(iii)     transactions and operations associated with the SoHo Store occurring there prior to transfer thereof to the MPL Parties;

    (iv)    transactions and operations associated with the PWW showroom occurring there after closing; or

    (v)    Any claim by any third party made against the MPL Parties that the manufacture, labeling or construction of the PWW Branded Goods caused personal injury and/or property damage; and

    (vi)    Any and all actions, suits, proceedings, demands, assessments, judgments, costs or expenses (including reasonable attorneys' fees and disbursements) related to any of the foregoing.

    (2)    *Notice of Claim.* The MPL Parties shall notify the PWW Parties in writing promptly after they have actual knowledge of any claim as to which indemnity may be sought (hereinafter referred to as an PWW Indemnitor Claim). If the claim is one brought by a third party as set forth in § 18 hereof , the PWW Parties shall be entitled, at their own expense, though legal counsel of their own choosing or otherwise, to defend or settle any such MPL Indemnitor Claim. If the MPL Parties, without the prior consent of the PWW Parties (which consent shall not be unreasonably withheld) makes any settlement with respect to any such PWW Indemnitor Claim, the PWW Parties shall be discharged from any liability hereunder with respect thereto, it being understood that the MPL Parties shall have the absolute right, in their sole discretion and without the consent of the PWW Parties to settle any and all such PWW Indemnitor Claims   If the PWW Parties fail to defend an PWW Indemnitor Claim as set forth in this § 18, the MPL Parties shall have the right to do so and the MPL Parties shall be entitled to recover, in addition to all amounts contemplated herein the entire cost of such defense from the PWW Parties. Any judgment rendered against the MPL Parties, or its successors or assigns, resulting in or from said PWW Indemnitor Claim, except during a stay of execution pursuant to an appeal at the PWW Parties expense, shall be immediately paid or discharged by the PWW Parties.

19.    *Notices.* Any notice or other communication required or permitted to be given hereunder shall be in writing and shall be mailed, at the option of the sender, by: (i) certified mail, return receipt requested; (ii) except to a Post Office Box address, by Federal Express or United Parcel Service, for next business day delivery; or (iii) by facsimile, with proof of receipt, to the addresses of the Parties hereto as set forth below (or such other address as the Parties hereto may have given notice pursuant to this § 19):

    If to the PWW Parties:

        Su-Hwei Lin
        110 Greene Street
        Suite 407
        New York, NY  10012
        (212) 925-1085

If to the MPL Parties:

> John B. Peters
> 77 Cornell Street
> Suite 302
> Kingston, NY 12401
> (845) 339-2006

20.    *Binding Effect.*  The provisions of this Agreement of Settlement shall be binding upon and inure to the benefit of the Parties and the successors of MPL, the successors and assigns of PWW, and the respective heirs, administrators, executors, and personal representatives of Mr. Peters and Ms. Lin.

21.    *Dispute Resolution.*  The Parties agree that any claim or dispute between them or against any agent, employee, successor or assign of the other, whether related to this Agreement of Settlement or otherwise, and any claim or dispute related to this Agreement of Settlement or to the relationship or duties contemplated under this Agreement of Settlement, including the validity of this clause, shall be resolved, if not by negotiation, then first by mediation, by Resolve Mediation Services, Inc., 575 Lexington Avenue, 10th Floor, New York, NY 10022-6117, (212) 355-6527 (http://www.mediators.com) under the mediation process provided by that neutral service provider.  In the event of a declaration of an impasse by Resolve Mediation Services, Inc., the Parties may proceed to litigation.

22.    *Releases and Corporate Representations*

    a.    Except as otherwise provided herein, John Peters, his heirs, administrators, successors and assigns, and MPL, its officers, directors, shareholders, affiliates, administrators, successors and assigns, as well as all others who may claim through one or more of them (hereinafter, individually and collectively, the "Peters Releasors"), do hereby release and forever discharge Su-Hwei Lin and her heirs, administrators, successors and assigns and PWW and its officers, directors, shareholders, affiliates, administrators, successors and assigns, as well as all others who may claim through one or more of them (hereinafter, individually and collectively, the "Lin Releasees"), of and from any and all debts, dues, demands, actions, causes of action, suits, setoffs, accounts, sums of money, bonds, bills, covenants, contracts, controversies, agreements, promises, trespasses, damages, judgments, claims, obligations, costs, expenses, losses, exposures, demands and liabilities whatsoever, of every name and nature, both in law and equity, known or unknown, past, present or future, which the Peters Releasors or any of them, now have or claim to have, at any time heretofore had or claimed to have, or at any time hereafter have or claim to have, against any or all of the Lin Releasees for, upon or by reason of any matter, cause or thing whatsoever from the

beginning of the world to the day of the date of this Release, except for the performance of their obligations hereunder.   Peters Releasors agree, for themselves and their respective agents, representatives, insurers, heirs, successors, attorneys and assigns, never to commence, prosecute, or aid in any way whatsoever any action or proceeding at law or in equity based upon, arising from or related to any claims released hereby.  If any such action or proceeding is instituted, this Agreement and the Release contained herein may be pleaded as a full and complete defense thereto and the Lin Releasees or the other Releasees named in this Paragraph, if named as a party in such action or proceeding, shall be entitled to, in addition to such other relief as may be granted by the court, an award of attorneys' fees and costs of court.

b.      Except as otherwise provided herein, Su-Hwei Lin, and her heirs, administrators, successors and assigns, and PWW, and its officers, directors, shareholders, affiliates, administrators, successors and assigns, as well as all others who may claim through one or more of them as well as all others who may claim through one or more of them (hereinafter, individually and collectively, the "Lin Releasors"), do hereby release and forever discharge John Peters and his heirs, administrators, successors and assigns, and MPL and its officers, directors, shareholders, affiliates, administrators, successors and assigns, as well as all others who may claim through one or more of them (hereinafter, individually and collectively, the "Peters Releasees"), of and from any and all debts, defenses, dues, demands, actions, causes of action, suits, setoffs, accounts, sums of money, bonds, bills, covenants, contracts, controversies, agreements, promises, trespasses, damages, judgments, claims, obligations, costs, expenses, losses, exposures, demands and liabilities whatsoever, of every name and nature, both in law and equity, known or unknown, past, present or future, which the Lin Releasors or any of them, now have or claim to have, at any time heretofore had or claimed to have, or at any time hereafter have or claim to have, against any or all of the Peters Releasees for, upon or by reason of any matter, cause or thing whatsoever from the beginning of the world to the day of the date of this Release, except for the performance of their obligations hereunder.  Lin Releasors agree, for themselves and their respective agents, representatives, insurers, heirs, successors, attorneys and assigns, never to commence, prosecute, or aid in any way whatsoever any action or proceeding at law or in equity based upon, arising from or related to any claims released hereby.  If any such action or proceeding is instituted, this Agreement and the Release contained herein may be pleaded as a full and complete defense thereto and the Peters Releasees or the other Releasees named in this Paragraph, if named as a party in such action or proceeding, shall be entitled to, in addition to such other relief as may be granted by the court, an award of attorneys' fees and costs of court.

23.    *Injunctive Relief.*    The MPL Parties acknowledge that the Manhattan Portage Trademark Rights are of a special, unique, unusual, extraordinary and intellectual character that gives them a peculiar value, and that in the event of a breach of this Agreement of Settlement by the MPL Parties that affects such rights and privileges, the PWW Parties will be caused irreparable injury. The MPL Parties expressly agree that the PWW Parties shall be entitled to the remedies of injunction and other equitable relief to prevent or remedy such a breach, which relief shall be in addition to any other rights and remedies, for damages or otherwise, that the PWW Parties may have. Notwithstanding § 21 hereof, the MPL Parties acknowledge that the PWW Parties may choose to seek injunction and other equitable remedies to prevent or remedy such a breach without resorting first to mediation and can maintain an action or motion for such relief concurrently with mediation.

24.    *Jurisdiction, Venue, and Service of Process.*  The Parties irrevocably consent to the exclusive jurisdiction of the courts of the State of New York, and any federal courts located in such State, and to exclusive venue in New York County (or the Southern District of New York), in connection with any action, proceeding, or motion to enforce, or for the breach of, this Agreement of Settlement.

**25.**    *Choice of Law.* The validity and construction of this Agreement of Settlement shall be governed by the laws of the State of New York, excluding the conflicts-of-laws principles thereof.

**26.**    *Confidentiality.* The Parties shall keep the terms of this settlement confidential, except as needed to give effect to or enforce the terms hereof.

**27.**    *Mutual Non-Disparagement.* The Parties will not make any statements disparaging one another.

**28.**    *No Admissions.* Execution of this Agreement of Settlement and of all related documents, and entry into any settlement of the Action and/or of the Parties' disputes shall not be construed as an admission of liability or culpability by any Party.

29.    *General.* This Agreement of Settlement states the entire agreement and understanding of the Parties on the subject matter of the Agreement of Settlement, and supersedes all previous agreements, arrangements, communications, and understandings relating to that subject matter. This Agreement of Settlement may be amended, modified, superseded or canceled, and any of the terms thereof may be waived, only by a written document signed by each of party to this Agreement of Settlement or, in the case of waiver, by the party or Parties waiving compliance. Except as provided expressly in this Agreement of Settlement, no person not a party to this Agreement of Settlement shall have or acquire any rights by reason of this Agreement of Settlement, nor shall any party to this Agreement of Settlement have any obligations or liabilities to such other person by reason of this Agreement of Settlement. Nothing in this Agreement of Settlement shall be deemed to constitute any party a partner, joint venturer, employer, employee, master, servant, principal or agent of any other party or of any other person.

30.   *Counterparts.* This Agreement may be signed in one or more counterparts, each of which shall be deemed an original, but all of which shall constitute one and the same instrument. Copies of this Agreement shall have the same force and effect as an original, and each party hereto expressly waives any right to assert that such copies fail to comply with the "Best Evidence Rule", or any equivalent rule or law of evidence of any other jurisdiction.

31.   *Severability.* In the event any term, provision, paragraph or section of this Agreement is, or is declared, illegal, void or unenforceable, same shall not affect or impair the other terms, provisions, paragraphs or sections of this Agreement. The doctrine of severability shall be applied. The parties do not intend by this statement to imply the illegality, voidness or unenforceability of any term, provision, paragraph or section of this Agreement.

32.   *Syntax.* All references made and pronouns used herein shall be construed in the singular or plural, and in such gender as the sense and circumstances require.

33.   *Headings.* The headings in this Agreement of Settlement are solely for convenience of reference and shall be given no effect in the construction or interpretation of this Agreement of Settlement.

34.   *Preparation.* This Agreement of Settlement is the product of informed arms-length negotiations between and among the Parties hereto, and has been entered into voluntarily, without coercion of any kind, after an opportunity by each Party to consult with competent counsel of his, her, and its choice, as applicable. This Agreement of Settlement shall be deemed to have been jointly prepared by the Parties and the terms hereof will not be overturned in favor of or against any Party to this Agreement of Settlement by reason of his, her, or its participation in such preparation.

35.   *Binding Effect of the Agreement of Settlement.*

a)   This agreement and all documents required to be executed by the parties in connection with the closing hereof shall constitute the definitive settlement and license agreements. Any such other agreements and documents, including the License Agreement and Pledge and Security Agreement, shall contain terms and conditions which are consistent with the terms herein and are intended to effectuate the same. But, pending the Closing and execution of those agreements, this Agreement of Settlement

shall be binding on the Parties hereto.  The Parties shall proceed expeditiously and in good faith to negotiate and execute definitive documents effectuating the terms and intent of this Agreement of Settlement and containing such other provisions as are standard for the transactions contemplated hereby. In that connection, and without limitation, it is the intent of the Parties to provide in the final settlement documents for mutual releases, for the discontinuance of the Action with prejudice and without costs to any Party, and for representations of the corporate Parties concerning their respective authority to enter into this Agreement of Settlement and any further agreements to resolve the Parties' present disputes and the Action, and regarding the transferability of PWW shares of stock, among other provisions appropriate and necessary for the transactions contemplated hereby

b)  Should the Parties have disputes concerning the completion or contents of other required settlement documents that they conclude cannot be resolved by negotiation, they agree to be bound by § 21 hereof.

c)  The Parties represent and warrant that they have not assigned or in any way conveyed, donated, transferred or encumbered all or any portion of the claims, rights, interests, disputes or causes of action that are the subject matter of this Agreement;

d)  The Parties represent and warrant that they are not aware of any person or entity possessing or claiming to possess any right to pursue or obtain recovery on any of the claims or causes of actions that are the subject matter of this Agreement; and

e)  The Parties represent and warrant that this Agreement has been duly authorized, executed and delivered, that they act with the requisite corporate authority, and that all necessary corporation actions have been taken to authorize and make this Agreement effective, and that this Agreement constitutes a legal, valid and binding obligation of each of the Parties.

**IN WITNESS WHEREOF,** the undersigned acknowledge that they have read, understood and agree with all matters stated in this Agreement of Settlement.

| | |
|---|---|
| John Peters | Su-Hwei Lin |
| Manhattan Portage Ltd. | Portage World-Wide, Inc. |
| By: John Peters, President | By: John Peters, President |
| | By: Su-Hwei Lin, Vice-President |

shall be binding on the Parties hereto. The Parties shall proceed expeditiously and in good faith to negotiate and execute definitive documents effectuating the terms and intent of this Agreement of Settlement and containing such other provisions as are standard for the transactions contemplated hereby. In that connection, and without limitation, it is the intent of the Parties to provide in the final settlement documents for mutual releases, for the discontinuance of the Action with prejudice and without costs to any Party, and for representations of the corporate Parties concerning their respective authority to enter into this Agreement of Settlement and any further agreements to resolve the Parties' present disputes and the Action, and regarding the transferability of PWW shares of stock, among other provisions appropriate and necessary for the transactions contemplated hereby

b)   Should the Parties have disputes concerning the completion or contents of other required settlement documents that they conclude cannot be resolved by negotiation, they agree to be bound by § 21 hereof.

c)   The Parties represent and warrant that they have not assigned or in any way conveyed, donated, transferred or encumbered all or any portion of the claims, rights, interests, disputes or causes of action that are the subject matter of this Agreement;

d)   The Parties represent and warrant that they are not aware of any person or entity possessing or claiming to possess any right to pursue or obtain recovery on any of the claims or causes of actions that are the subject matter of this Agreement; and

e)   The Parties represent and warrant that this Agreement has been duly authorized, executed and delivered, that they act with the requisite corporate authority, and that all necessary corporation actions have been taken to authorize and make this Agreement effective, and that this Agreement constitutes a legal, valid and binding obligation of each of the Parties.

**IN WITNESS WHEREOF,** the undersigned acknowledge that they have read, understood and agree with all matters stated in this Agreement of Settlement.

_____               _____
John Peters                                         Su-Hwei Lin

Manhattan Portage Ltd.                    Portage World-Wide, Inc.


By: _____                       By: _____
John Peters                                         John Peters
President                                             President

                                                          By: _____
                                                          Su-Hwei Lin
                                                          Vice-President


Agreement of Settlement                    - 15 -

**EXHIBIT B**

LICENSE AGREEMENT, dated as of September 5, 2006 by and between Portage World-Wide, Inc. ("Licensor"), with a place of business at 110 Greene Street, Suite 407, New York, NY 10012, and Manhattan Portage, Ltd. ("Licensee") , a New York corporation with a place of business at 77 Cornell Street, Suite 302, Kingston, NY 12401.

**WHEREAS**, Licensor and Licensee have entered into a certain Agreement of Settlement (the "Settlement Agreement") and a Pledge and Security Agreement (the "Pledge Agreement"), each dated as of September 5, 2006;

**WHEREAS**, Licensor, pursuant to the terms of the Settlement Agreement, is the Assignee and owner of the trademark, service marks and trade names listed on Schedules "A" annexed hereto (all such marks or names hereinafter referred to as the "Trademark"), as evidenced by (with respect to the Trademark listed on Schedule A) records in the United States Patent and Trademark Office; and

**WHEREAS**, Licensor is the owner of and has exclusive right, title and interest in and to said Trademark;

**WHEREAS**, pursuant to Settlement Agreement, the parties hereto have agreed that Licensor will grant to the Licensee, subject to the terms of the Settlement Agreement and this Agreement, a license to use the Trademark for the purposes hereafter set forth; and

**WHEREAS**, Licensee desires to obtain, and Licensor is willing to grant, a license pursuant to which Licensee shall have the right to use the Trademark (as hereinafter defined) on the terms set forth herein;

1.    Definitions.

   a.    All capitalized terms used in this Agreement and not otherwise defined herein shall have the meanings assigned thereto in the Settlement Agreement, which definitions are incorporated herein and made a part hereof by reference.

   b.    "License" shall mean the non-exclusive, non-assignable (except with the written consent of the Licensor) right to use the Trademark in connection with the manufacture and sale of MPL Branded Goods.

   c.    "Licensed Products" shall mean MPL Branded Goods.

   d.    "Licensor" shall mean Portage World-Wide, Inc..

   e.    "Licensee" shall mean Manhattan Portage, Ltd.

   f.    "Territory" shall mean the MPL Territory

   g.    "Trademark" shall mean the Manhattan Portage Trademark, as assigned by Licensee to

the Licensor under the Settlement Agreement.

2.  Grant of License.

    a.  Subject to the terms and provisions hereof, Licensor hereby grants Licensee and Licensee hereby accepts the License in connection with the manufacture and sale of MPL Branded Goods in the Territory during the term of this Agreement.

    b.  It is understood and agreed that the License applies solely to the use of the Trademark on MPL Branded Goods and that no use of the Trademark on any other products is authorized or permitted. Licensor reserves the right to use, and to grant to any other licensee the right to use the Trademark, to the extent that the Licensor, itself, has the right to use the Trademark under the terms of the Settlement Agreement, whether within or outside the Territory, in connection with any and all products and services, .

    c.  Licensor represents and warrants that it has full right, power and authority to enter into this Agreement, to perform all of its obligations hereunder, and to consummate all of the transactions contemplated herein.

    d.  Except as otherwise provided herein or in the Settlement Agreement, Licensee shall not grant or purport to grant any right, permission or license hereunder to any third party, whether at common law or otherwise. Licensee shall not without Licensor's prior written approval sell any Licensed Products bearing the Mark to any third party which, directly or indirectly, sells or proposes to sell such Licensed Products outside the Territory. Licensee shall use its best efforts to prevent any such resale outside the Territory and shall, immediately upon learning or receiving notice from Licensor that a customer is selling Licensed Products outside the Territory, cease all sales and deliveries to such customer.

3.  Quality Standards of Licensed Products.

    a.  Licensee acknowledges that the Trademark has established prestige and goodwill and is well recognized in the minds of the public, and that it is of great importance to each party that in the manufacture and sale of Licensor's products, including the Licensed Products, the high standards heretofore established for the Licensed Products be maintained. Accordingly, all items of Licensed Products manufactured or caused to be manufactured by Licensee hereunder shall be of high quality workmanship. No sales of miscuts or damaged merchandise shall contain any labels or other identification bearing the Trademark without Licensor's prior written approval.

    b.  In the event that any Licensed Product is, in the judgment of Licensor, not being manufactured, distributed or sold with first quality workmanship, Licensor shall notify Licensee thereof in writing and Licensee shall promptly repair or change such Licensed Product to conform thereto. If a Licensed Product as repaired or changed does not strictly conform after Licensor's request and such strict conformity cannot be obtained

-2-

after at least one (1) resubmission, the Trademark shall be promptly removed from the item, at the option of Licensor, in which event the item may be sold by Licensee, provided such miscut or damaged item does not contain any labels or other identification bearing the Trademark. The term "first quality workmanship" shall have the meaning ascribed thereto, or to terms of similar import, as accepted and used in the industry, insofar as it relates to the manufacture of goods of the same type as the Licensed Products.

   c. Licensee shall cause to be placed on all Licensed Products appropriate notice designating Licensor as the Trademark owner.

4. Marketing.

   a. The distribution of the Licensed Products shall, subject to the provisions and limitations set forth in the Settlement Agreement, be performed by Licensee exclusively in the Territory and only to those customers and classes of customers described in the Settlement Agreement.

   b. Licensee shall maintain the high standards of the Trademark and the Licensed Products, in all advertising, packaging and promotion of the Licensed Products.

   c. Licensee shall take all necessary steps, and all steps reasonably requested by Licensor, to prevent or avoid any misuse of the Trademark by any of its customers, contractors or other resources.

5. Trademark Protection.

   a. All uses of the Trademark by Licensee, including, without limitation, use in any business documents, invoices, stationery, advertising, promotions, labels, packaging and otherwise shall require Licensor's prior written consent in accordance with paragraph 4 hereof.

   b. All uses of the Trademark by Licensee in advertising, promotions, labels and packaging shall bear a notice in form and substance reasonably approved by the Licensor to the effect that such Trademark is owned by and constitutes the intellectual property of the Licensor. Except as otherwise provided herein, Licensor approves the use of the notice: "Registered Trademark, owned by and the exclusive property of Portage World-Wide, Inc., its successors and assigns, Reg. U.S.P.T.O. No. 2075388". Licensor shall have the right to change such approved notice, from time-to-time, in order to conform to any renewed or amended registration issued by the United States Patent and Trademark Office with respect to the Trademark or as required by law. The use of the Trademark pursuant to this Agreement shall not vest in Licensee any title to or right or presumptive right to continue such use. For the purposes of trademark registration, sales by Licensee shall be deemed to have been made by Licensor.

-3-

c. Licensee shall cooperate fully and in good faith with Licensor for the purpose of securing and preserving Licensor's rights in and to the Trademark. Nothing contained in this Agreement shall be construed as an assignment or grant to Licensee of any right, title or interest in or to the Trademark, or any of Licensor's other trademarks, it being understood that all rights relating thereto are reserved by Licensor, except for the License hereunder to Licensee of the right to use the Trademark only as specifically and expressly provided herein. Licensee shall not file or prosecute a trademark or service mark application or applications to register the Trademark, for Licensed Products or otherwise.

d. Licensee shall not, during the term of this Agreement or thereafter, (a) attack Licensor's title or rights in and to Licensor's trademarks in any jurisdiction or attack the validity of this License or Licensor's trademarks or (b) contest the fact that Licensee's rights under this Agreement (i) are solely those of a licensee, manufacturer and distributor and (ii) cease upon termination of this Agreement. The provisions of this paragraph * shall survive the termination of this Agreement.

e. Licensee shall assist Licensor to the extent necessary in the protection of or the procurement of any protection of Licensor's rights to the Trademark and Licensor, if Licensor so desires, may commence or prosecute any claims or suits in Licensor's own name or in the name of Licensee or join Licensee as a party thereto. Licensee shall promptly notify Licensor in writing of any uses which may be infringements or imitations by others of the Trademark on articles similar to those covered by this Agreement which may come to Licensee's attention. Licensor shall have the sole right to determine whether or not any action shall be taken on account of any such infringements or imitations. Licensor shall bear one hundred percent (100%) of the costs of all actions or proceedings it undertakes, and shall be entitled to all recoveries in such actions. The Licensor shall promptly, upon demand, reimburse and indemnify the Licensee for all reasonable costs and reasonable expenses, including attorneys' fees, incurred by the Licensee in the fulfillment of the provisions of this paragraph.

f. With the exception of its use of the Trademark, as permitted hereunder, Licensee shall not use any trademark, tradename, logo or any similar symbols of identification which are confusingly similar to the Trademark in connection with the manufacture, sale or marketing of any products or services or the conduct of any business.

6. Term.

a. The term of this Agreement shall commence as of the date hereof and shall terminate on September  , 2016.

7. Default.

a. Each of the following shall constitute an event of default ("Event of Default") hereunder:

-4-

    i.   Licensee defaults in performing any of the terms of this Agreement or the Settlement Agreement and continues in such default for a period of thirty (30) days after written notice thereof (unless the default cannot be cured within such thirty (30) day period and Licensee shall have commenced to cure the default and proceeds diligently thereafter to cure within an additional fifteen (15) day period);

   ii.   Licensee institutes proceedings seeking relief under a bankruptcy act or any similar law, or consents to entry of any order for relief against it in any bankruptcy or insolvency proceeding or similar proceeding, or files a petition for or consent or answer consenting to reorganization or other relief under any bankruptcy act or other similar law, or consents to the filing against it of any petition for the appointment of a receiver, liquidator, assignee, trustee, custodian, sequestrator (or other similar official) of it or of any substantial part of its property, or a proceeding seeking such an appointment shall have been commenced without Licensee's consent and shall continue undismissed for sixty (60) days or an order providing for such an appointment shall have been entered, or makes an assignment for the benefit of creditors, or admits in writing its inability to pay its debts as they become due or fails to pay its debts as they become due, or takes any action in furtherance of the foregoing;

  iii.   The calling of a meeting of creditors, appointment of a committee of creditors or liquidating agents, or offering a composition or extension to creditors by, for or of Licensee.

  iv.  Licensee dissolves, liquidates or winds up its affairs.

  b.  If any Event of Default shall occur and shall not have been cured within the applicable time period, Licensor shall have the right, exercisable in its sole discretion, to terminate this Agreement and the License upon ten (10) days' written notice to Licensee of its intention to do so, and upon the expiration of such ten (10) day period, this Agreement and the License shall terminate and come to an end.

8.   Effect of Termination.

  a.  It is understood and agreed that except for the License to use the Trademark as specifically provided for in this Agreement, Licensee shall have no right, title or interest in or to the Trademark. Upon and after the termination of this License, all rights granted to Licensee hereunder, together with any interest in and to the Trademark which Licensee may acquire, shall forthwith and without further act or instrument be assigned to and revert to Licensor. In addition, Licensee will execute any instruments reasonably requested by Licensor which are necessary to accomplish or confirm the foregoing. Any such assignment, transfer or conveyance shall be without consideration other than the mutual agreements contained herein. Licensee shall thereafter refrain from further use of the Trademark or any further reference to them, direct or indirect, or any other trademark, trade name or logo that is confusingly similar to the Trademark, or associated

with the Trademark in any way, in connection with the manufacture, sale or distribution of Licensee's products. It is expressly understood that under no circumstances shall Licensee be entitled, directly or indirectly, to any form of compensation or indemnity from Licensor as a consequence to the termination of this Agreement, whether as a result of the passage of time, or as the result of any other cause of termination referred to in this Agreement.

b. Licensee acknowledges and admits that there would be no adequate remedy at law for its failure to cease the manufacture or sale of the Licensed Products covered by this Agreement at the termination of the License, and Licensee agrees that in the event of such failure Licensor shall be entitled to equitable relief by the way of temporary and permanent injunction and such other and further relief as any court with jurisdiction may deem just and proper.

9. Miscellaneous.

a. All notices, requests, consents and other communications hereunder shall be in writing and shall be deemed to have been properly given or sent (i) on the date when such notice, request, consent or communication is personally delivered or (ii) five (5) days after the same was sent, if sent by certified or registered mail or (iii) two (2) days after the same was sent, if sent by overnight courier delivery or confirmed telecopier, as follows:

    i.  if to Licensee, addressed as follows:
        Manhattan Portage, Ltd.
        77 Cornell Street, Suite 302
        Kingston, NY 12401
        (845) 339-2006
        Attention: John B. Peters

    ii.  if to Licensor, addressed as follows:
        Portage World-Wide, Inc.
        110 Greene Street, Suite 407
        New York, NY 10012
        New York, NY 10012
        Attention: Su-Hwei Lin

Anyone entitled to notice hereunder may change the address to which notices or other communications are to be sent to it by notice given in the manner contemplated hereby.

b. Nothing herein contained shall be construed to place the parties in the relationship of partners or joint venturers, and no party hereto shall have any power to obligate or bind any other party hereto in any manner whatsoever, except as otherwise provided for herein.

c. The terms and provisions of the Settlement Agreement and the Pledge Agreement are hereby incorporated herein by reference.

d. None of the terms hereof can be waived or modified except by an express agreement in writing signed by the party to be charged. The failure of any party hereto to enforce, or the delay by any party in enforcing, any of its rights hereunder shall not be deemed a continuing waiver or a modification thereof and any party may, within the time provided by applicable law, commence appropriate legal proceedings to enforce any and all of such rights. All rights and remedies provided for herein shall be cumulative and in addition to any other rights or remedies such parties may have at law or in equity. Any party hereto may employ any of the remedies available to it with respect to any of its rights hereunder without prejudice to the use by it in the future of any other remedy with respect to any of such rights. No person, firm or corporation, other than the parties hereto shall be deemed to have acquired any rights by reason of anything contained in this Agreement.

e. This Agreement shall be binding upon and inure to the benefit of the successors and permitted assigns of the parties hereto. Licensor may assign all of its rights, duties and obligations hereunder to any entity to which the Trademark, or the right to use the Trademark, has been transferred, or to an affiliate of any such entity. The rights granted to Licensee hereunder are unique and personal in nature, and neither this Agreement nor the License may be assigned by Licensee without Licensor's prior written consent, which may be withheld in Licensor's sole discretion. Any attempt by Licensee to transfer any of its rights or obligations under this Agreement, whether by assignment, sublicense or otherwise, without having received the prior written consent of Licensor shall constitute an Event of Default, but shall otherwise be null and void.

f. Licensee shall comply with all laws, rules, regulations and requirements of any governmental body which may be applicable to the operations of Licensee contemplated hereby, including, without limitation, as they relate to the manufacture, distribution, sale or promotion of Licensed Products.

g. This Agreement shall be construed in accordance with and governed by the laws of the State of New York, applicable to contracts made and to be wholly performed therein without regard to its conflicts of law rules.

h. The parties hereby consent to the jurisdiction of the United States District Court for the Southern District of New York and of any of the courts of the Southern District of New York and of any of the courts of the State of New York located within the Southern District in any dispute arising under this Agreement.

i. The provisions hereof are severable, and if any provision shall be held invalid or unenforceable in whole or in part in any jurisdiction, then such invalidity or unenforceability shall affect only such provision, or part thereof in such jurisdiction and shall not in any manner affect such provision in any other jurisdiction, or any other

-7-

provision in this Agreement in any jurisdiction. To the extent legally permissible, an arrangement which reflects the original intent of the parties shall be substituted for such invalid or unenforceable provision.

j.  The paragraph headings contained in this Agreement are for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement.

k.  This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement or caused the same to be executed by a duly authorized officer as of the day and year first above written.

MANHATTAN PORTAGE, LTD.          PORTAGE WORLD-WIDE, LTD.


By: _____     By: _____

-8-

DRAFT
LICENSE AGREEMENT
Rev. 4

MANHATTAN PORTAGE, LTD.                    PORTAGE WORLD-WIDE, LTD.

By: _____            By: _____

**EXHIBIT C**



**MANHATTAN PORTAGE LTD.**
77 Cornell St. #302
Kingston, NY 12401
845-339-2006
339-1948 fax
Mhtnprtg@aol.com

9·26·2006

As part of Manhattan Portage LTD's licensing agreement with Portage World-Wide, dated September 5, 2006, for the use of the MANHATTAN PORTAGE trademark, Reg. U.S.P.T.O. No. 2075388, we will take the following steps which we accept as incorporated into the licensing agreement and legally binding.

1. The words on the trademark, "MADE IN" and "LTD", respectively, will be deleted from the labels that will be externally sewn on to MPL branded goods.
2. The sizes of the external labels are to be as follows:
  Seam sewn -  2"w x 3/4" h
  Small - 1 1/2"w x 1 3/4"h
  Medium - 2 1/2"w x 2"h
  Large - 3 3/4"w x 2"h
3. Notice of the trademark's ownership will be sewn on internal labels of a size that will fit the text, *Registered Trademark, owned by and the exclusive property of Portage World-Wide, its successors and assigns, Reg. U.S.P.T.O. No. 2075388.*
4. In addition to the use of the trademark on the labels, MPL will initially use the trademark in the signage for the SoHo store and in advertising and public relations material, including a product catalogue.
5. Attribution of ownership will occur in each instance of the trademark's use, including on signage. Asterisked reference to ownership will be used where appropriate.

Very truly yours,

JOHN PETERS, PRESIDENT
c: Mark Skolnick, Esq.